GROTH ET AL., PLAINTIFFS IN ERROR, v. KERSTING ET AL., DEFENDANTS IN ERROR.

1. APPELLATE PRACTICE—IMMATERIAL ERROR.
The reception of immaterial or irrelevant testimony, when a cause is tried before a referee, is not, of itself, reversible error.

2. APPELLATE PRACTICE—REFEREE'S FINDINGS OF FACT CONCLUSIVE.
When the case was tried on the testimony of witnesses examined orally before a referee and was decided upon that evidence, the finding of the referee upon questions of fact is conclusive upon review, and this court is not required either to examine or consider the evidence.

3. DISCRETION—LIMITING ARGUMENT.
The trial court has power, in its discretion, to limit argument of counsel, and its action in this connection is not the subject-matter of review, unless, possibly, in case of very evident and plain abuse of such discretion.

*Error to the District Court of Arapahoe County.*

Messrs. ROGERS & STAIR, for plaintiffs in error.

Mr. T. J. O'DONNELL and Mr. W. S. DECKER, for defendants in error.

BISSELL, P. J., delivered the opinion of the court.

The decision of this case requires the settlement of no

principles, and in its legal aspects is controlled by rules from which there has seldom been a deviation in appellate procedure.

In January, 1889, Kersting & Wilmsmeier were running a brick yard for the manufacture of bricks in North Denver. Groth & Becker were at that time contractors prosecuting their business in Denver and its vicinity. Considerable dealings had been had for some little time between the two firms, and the propriety of a union of their interests and business seems to have occurred to the parties. As a result, Kersting & Wilmsmeier had several interviews with Groth, looking to an extension of the business, his entry into the firm, and the furnishing of whatever brick Groth & Becker might require in putting up the buildings for which they might subsequently contract. The brickmakers ultimately procured a lease on some ground on East Capitol Hill, on which they could make fifty or seventy-five thousand bricks per day, which was nearly double the extent of the capacity of the North Denver yard. The terms of the copartnership will be subsequently stated. Before work was begun, Kersting & Company removed to the new yard all of the tools, machinery and appliances for the manufacture of brick which they owned, together with the horses and wagons and whatever they had adapted to the business. When the season opened for making brick in 1889, Kersting & Company made large quantities of brick, and delivered what was known to the trade as "salmon," "red," and "hard," and "stock" brick to Groth & Becker, who used them in the various contracts which they were executing. The business continued during 1889 and to about the middle of 1890, when the parties disagreed, were unable to come to terms as to a settlement of the business, and shortly afterwards started this litigation to wind up the affairs of the concern. It was originally commenced as one suit, and the plaintiffs thereby sought to recover a little upwards of eleven thousand dollars, as money due from Groth & Becker to Kersting & Company, and resulting from the partnership transactions. The proceeding was attacked as being a union

of legal and equitable remedies in the same suit, and subsequently there was a division of the cause, and a legal action aided by attachment was brought by Kersting & Company against Groth & Becker to recover the amount which they owed for the brick, and a bill in equity was filed for the dissolution and winding up of the affairs of the copartnership. The two suits were ultimately consolidated and tried as one. It appeared at the time of the trial that the books of Kersting & Company had been stolen, and they experienced a good deal of difficulty in showing exactly the amount of brick furnished to Groth & Becker, as well as to other parties ; but this difficulty was lightened by an admission by Groth & Becker that they had received a definite quantity of brick amounting to nearly six million. Kersting & Company had trouble not only in proving the amount of brick, but also in showing the quantities of the respective grades which they had furnished. About the time of the dissolution and the disagreement, Groth and his bookkeeper, one Meyer, were at the yard, went through the books, and apparently got from them all the material which they contained with reference to qualities, quantities and prices. It is also quite apparent that Groth & Company, from the bills which were rendered, the tickets which they had received and their own books, were pretty accurately advised in regard to these various matters, although they disputed each proposition during the progress of the trial. The issue concerning the terms of the copartnership is very sharply defined in the testimony. Kersting & Wilmsmeier contended that Groth agreed to become individually a member of the firm of Kersting & Company, and to contribute eight thousand dollars in cash as his share of the capital of the concern, which he was to put in as an offset to the tools, machinery, appliances, good will and advantages which would follow purchasing brick at a yard in the profits of which Groth shared. On the other hand, Groth & Becker testified that the agreement of copartnership was made at a particular place and at a definite time, and did not contemplate any contribution of capital whatever, except the

advancement of such money as might be necessary to enable the business to proceed, until by the sales of brick the yard became self-supporting. They insisted that the correlative obligation of Kersting & Company was to sell the brick at a definite price of five dollars per thousand, which as they figured would be less than the actual cost of manufacture, but not enough less to leave Kersting & Company much if any profit. In reality this was and is the only issue of consequence, and a finding one way or the other on this matter of fact of necessity determined the judgment below, and is equally conclusive of the result in this court. It is the only question which justifies a discussion or an argument, and a conclusion adverse to the finding of the referee is a necessary condition precedent to a reversal of the case. Notwithstanding this consideration, counsel in the exercise of their professional rights and discretion have flooded us with multitudinous exceptions which are strongly suggestive of the pests with which the people of Egypt were plagued to compel them to free the children of Israel. The exceptions number one hundred and fifty. They are sought to be supported by upwards of five hundred pages of abstract and brief, and of about twelve hundred pages of a bill of exceptions. We are quite unable to understand why the burden of settling immaterial matters is sought to be placed on the court. The first hundred and twenty-five assignments of error relate solely to the rulings of the referee with reference to the introduction of testimony. Most of them are based on the theory that the questions were irrelevant, or so formulated as to be open to the criticism that they were leading and suggestive, or the inquiry immaterial. These matters could not be settled by reference to the abstract, but the court was compelled to examine the vast record with reference to each proposition to determine whether such an error had been committed as would justify us in disturbing the judgment.

Manifestly questions of this sort are never of the character and gravity to justify a court in setting aside a judgment unless force be given to the objections by an unanswerable ar-

gument based on a discussion of one of the main issues.    The reception of immaterial or irrelevant testimony where a cause is tried before a court of referee is not one of those errors which is deemed adequate by itself to reverse a judgment. *Mining Co. v. Taylor*, 100 U. S. 37 ; *Insurance Co. v. Friedenthal*, 1 Colo. App. 5 ; *Rollins v. Commissioners*, 15 Colo. 104.

As before stated, the whole case then turns upon the solution of the main inquiry—what was the agreement of copartnership, and was anything due from Groth & Becker to Kersting & Company for bricks manufactured and sold to them ?   We were under no obligations to examine the record with respect to this proposition.   The case was tried on the testimony of witnesses examined orally before the referee, and was decided upon that evidence, and on the supporting testimony furnished by books of account, tickets, bills and various other memoranda gathered from different sources, and tending to support the plaintiffs' claim.   Under these circumstances, the finding of the referee upon the questions of fact is entirely conclusive, and we are not required on this appeal to either examine or consider the evidence.   *Kimball et al. v. Lyons*, 19 Colo. 266.

This recent declaration of the Supreme Court of the state is simply in line with a long series of adjudications by the courts on this proposition.   Notwithstanding this fact, and in order to determine whether or not we were called upon to reverse the case because of any of the hundred and twenty errors assigned with reference to the admission of testimony, we read not only the abstract but the bill of exceptions so far as it related to this main issue, to wit: the partnership and its terms.   On the conclusion of this examination, we were thoroughly satisfied that the referee did not err in his conclusions respecting the agreement, and that his finding was fully justified by the testimony.   We did not examine the entire record to ascertain whether in all respects and exactly the account as stated was correct; but since we found the referee evidently right on the main proposition, we left his conclusions to stand as we had the right to do, under the

rule laid down in the case last cited. We do not wish to be understood as saying that we made no examination of the account, because it was both examined and computed, and we were unable to discover any error; but we did not read the entire record as contained in the bill of exceptions, for the purpose of ascertaining whether the basis which the referee took for the computation of his statement was fully supported by the proof. His finding was apparently right, and we are not inclined to disturb it.

It is contended that a legal error resulted from the suing out of an attachment by Kersting & Wilmsmeier in the action which they brought against Groth & Becker to recover the sum due, because Groth was a common member of both firms. We are not called upon to decide what the legal rights of two firms having a common member may be, or what remedies may be resorted to for their enforcement. The motion to dissolve the attachment was overruled without objection, nor was any exception taken to the order made respecting it. Under these circumstances, the matter is not properly before us for consideration and may be wholly disregarded. Some complaint is made by counsel of the action taken by the district court on the incoming of the report of the referee restricting his liberty respecting the argument on the exceptions filed to the report. The court undoubtedly declined to allow counsel all the time that he deemed necessary for the argument; but we do not understand that the action of trial courts in matters of this description is the subject-matter of review. It certainly is not, unless there has very evidently and plainly been an abuse of the exercise of that discretion which *nisi prius* courts possess with reference to the trial of cases. We cannot perceive on an examination of the proceedings below that there was any such abuse of discretion on the part of the court, as would either call for or necessitate any interference on our part, or even the expression of a criticism respecting it. The only other matter which need be referred to at all is the contention respecting the interest which Groth had in the new firm of Kersting & Company.

The referee found as a matter of fact that the firm of Groth & Becker did 'not become members of the new copartnership; but that Groth with Kersting and Wilmsmeier formed the new firm. This finding is conclusive. It is fully and satisfactorily settled by the proof, and we are without inclination to disturb or question it. The legal result is manifest, and the proportion of profits which would belong to Groth is not open to dispute. Under the terms of the copartnership as found by the referee, and with which we coincide, the new firm consisted of three members, who were to contribute a certain amount to the capital of the concern, and were to share equally in the profits. Under these circumstances, the legal conclusions of the referee are fully sustained by the law.

The finding of the referee was correct, he committed no legal error which warrants us to set aside the judgment, and it will accordingly be affirmed.

*Affirmed.*